UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

NELSON GALLEGO, as Administrator of the
Estate of JILLIAN ROSE CASTRO FIGUEROA,

                    Plaintiff,

          v.

TANDEM DIABETES CARE, INC.,

                    Defendant.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
24-CV-146 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Nelson Gallego, as administrator of the estate of Jillian Rose Castro Figueroa

("Decedent"), commenced the above-captioned action against Defendant Tandem Diabetes Care,

Inc. on December 13, 2023, in the Supreme Court of the State of New York, Queens County

("Queens County State Court"), asserting claims of strict products liability based on

manufacturing defect, negligent defective design, negligence, strict products liability based on

failure to warn, breach of implied warranty of merchantability, and wrongful death under New

York law arising out of Decedent's use of an insulin pump that Defendant designed and

manufactured.  (Not. of Removal ¶¶ 1–2, Docket Entry No. 1.)  On January 8, 2024, Defendant

removed the action to the Eastern District of New York, invoking diversity jurisdiction under 28

U.S.C. § 1332.  (*Id.* ¶ 9.)  On February 15, 2024, Plaintiff filed an Amended Complaint asserting

the same causes of action and adding more factual allegations.  (Am. Compl., Docket Entry No.

15.)

On April 12, 2024, Defendant moved to dismiss the Amended Complaint for failure to

state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Plaintiff

opposed the motion.[1]  On March 28, 2025, the Court granted Defendant's motion and dismissed without prejudice Plaintiff's (1) negligent defective design claim and (2) "his wrongful death claim to the extent it [was] based on the nonpreempted negligent defective design claim," ("March 2025 Decision").[2]  (March 2025 Decision 39.)  *Gallego v. Tandem Diabetes Care, Inc.*, 776 F. Supp. 3d 119, 145 (E.D.N.Y. 2025).

On June 13, 2025, Plaintiff filed his Second Amended Complaint ("SAC") in response to the March 2025 Decision.  (SAC, Docket Entry No. 35.)  On July 11, 2025, Defendant moved to dismiss the SAC and Plaintiff opposed the motion.[3]  For the reasons stated below, the Court grants Defendant's motion to dismiss the SAC with prejudice.

## I.    Background

The Court assumes familiarity with the facts as detailed in the March 2025 Decision, which it briefly summarizes below.  The Court therefore focuses on the new facts alleged in the SAC.

---

[1]  (Def.'s Not. of Mot. to Dismiss ("Def.'s Mot."), Docket Entry No. 21; Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), appended to Def.'s Mot., Docket Entry No. 21-1; Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), Docket Entry No. 24; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket Entry No. 25.)  On August 5, 2024, Defendant filed a notice of supplemental authority to which Plaintiff responded.  (Def.'s Not. of Suppl. Authority ("Def.'s First Not."), Docket Entry No. 26; Pl.'s Resp. to Def.'s First Not., Docket Entry No. 27.)  On August 28, 2024, Defendant filed a second notice of supplemental authority.  (Def.'s Not. of Suppl. Authority ("Def.'s Second Not."), Docket Entry No. 28.)

[2]  The Court dismissed with prejudice "Plaintiff's claims for strict products liability based on manufacturing defect, negligence, strict products liability based on failure to warn, and breach of implied warranty of merchantability on preemption grounds and Plaintiff's wrongful death claim to the extent based on these preempted claims for failure to state a claim."  (March 2025 Decision 39, Docket Entry No. 29.)  *Gallego v. Tandem Diabetes Care, Inc.*, 776 F. Supp. 3d 119, 146 (E.D.N.Y. 2025).

[3]  (Def.'s Not. of Mot. to Dismiss the SAC ("Def.'s SAC Mot."), Docket Entry No. 37; Def.'s Mem. in Supp. of Def.'s SAC Mot. ("Def.'s SAC Mem."), appended to Def.'s SAC Mot., Docket Entry No. 37-1; Pl.'s Opp'n to Def.'s SAC Mot. ("Pl.'s SAC Opp'n"), Docket Entry No. 42; Def.'s Reply in Supp. of Def.'s SAC Mot. ("Def.'s SAC Reply"), Docket Entry No. 41.)

a. **Decedent's t:slim X2 insulin pump**

Decedent, a diabetic, depended on the t:slim X2 insulin pump ("X2 Pump") issued by Defendant for continuous glucose monitoring ("CGM") and insulin administration. (March 2025 Decision 4–5.) The X2 Pump is a Class III medical device subject to the U.S. Food and Drug Administration's ("FDA") pre-market approval ("PMA") process.[4] (*Id.* at 4.) Pursuant to the PMA process, "manufacturers of insulin pumps, including the [X2 Pump], cannot make any changes to the design specifications, manufacturing process, labeling, warnings, requirements for alerts and/or alarms, or any other attribute that would affect the product's safety or effectiveness absent additional FDA approval." (SAC ¶ 12.) In addition, the PMA Process required the X2 Pump "to comply with multiple failure modes, including in anticipation of the potential that the pump may be dropped, that the pump may have mechanical issues including drive train failure or insufficient drive train force as identified by the FDA during the PMA process for the subject pump," (*id.* ¶ 13), and have alarms built into the X2 Pump that "notify the user and/or manufacturer of certain failures of the pump, including mechanical malfunctions and failures, such as a drive train failure," (*id.* ¶ 15).

Plaintiff alleges that from at least July of 2020 through January of 2021, at least thirty-

---

[4] In its first motion to dismiss, Defendant challenged whether the relevant device was a Class II or Class III model and included a Class II model's user guide as an Exhibit. (March 2025 Decision 6–7.) In its March 2025 Decision, the Court declined to take judicial notice of the exhibit as Defendant failed to show that the manual guide's model was the same model that Plaintiff alleges Decedent used. (*Id.* at 8–9.) In addition, the Court accepted Plaintiff's allegations as true and conducted its analysis of the device under a Class III designation. (*See id.* at 6–9, 9 n.4.) In its motion to dismiss the SAC, Defendant does not explicitly concede that the device Decedent used was a Class III device, but accepts the conclusion of the March 2025 Decision that the Decedent used a Class III device and proceeds in its arguments with a discussion regarding a Class III device. (*See* Def.'s SAC Mem. 6, 8, 11.) The Court notes that Defendant attaches the same Class II user manual guide as an Exhibit. (X2 Pump User Guide, annexed to Decl. of Jenny A. Covington, Esq. ("Covington Decl.") as Ex. A, Docket Entry No. 37-3.) Despite this attachment, the Court does not address the discrepancy further given Defendant's lack of argument on the classification of Decedent's device.

3

seven records from Defendant addressing "patient impact" described a mechanical problem related to the X2 Pump's cartridges.  (*Id.* ¶ 37.)

### b.   Decedent's use of the X2 Pump

On January 21, 2022, at approximately 8:24 A.M., Decedent received a message on the X2 Pump indicating that the X2 Pump could not load the insulin cartridge and stated the following: "ALL DELIVERIES STOPPED!  This cartridge cannot be used.  Remove and replace with a new cartridge."  (SAC ¶ 20.)  As a result, insulin delivery to Decedent stopped.  (*Id.* ¶¶ 21, 30.)  At approximately 8:42 A.M., Decedent called Defendant and spoke with a customer support agent who advised Decedent to go home and get a new cartridge but did not tell Decedent to call 911 or seek medical care.  (*Id.* ¶¶ 22–25.)  Decedent advised the customer support agent that the X2 pump "had fallen a few times."  (*Id.* ¶ 22.)  Plaintiff alleges that Defendant's customer support agent did not advise Decedent that there was "a possibility of pump failure and/or mechanical failure, and/or drive train failure," (*id.* ¶ 26), and Decedent never received an alert or alarm specifically warning of said failure, (*id.* ¶ 27).  Plaintiff contends that Decedent did not receive the necessary insulin as a result of the X2 Pump's failure and was found dead in her residence on January 21, 2022.  (*Id.* ¶¶ 30–31.)

Defendant's report inspecting the Decedent's X2 Pump after her death (1) "found that the device was unable to complete the cartridge load sequence, indicating that the drive train in the pump was not functioning properly," (*id.* ¶ 32), and (2) "the device log did not show that a pump malfunction warning or alert occurred, despite a pump and/or mechanical malfunction being classified as a critical event during the PMA process and required to be saved under [s]ection[s] M(5)(c) and M(5)(d) of the [X2 P]ump's PMA application," (*id.* ¶ 33).  (*See* Device Evaluation

Report, annexed to Covington Decl. as Ex. B, Docket Entry No. 37-4; Decedent's X2 Pump

Service Logs, annexed to Covington Decl. as Ex. C, Docket Entry No. 37-5.)[5]

      **c.    March 2025 Decision**

In the March 2025 Decision, the Court found that Plaintiff inadequately pled a negligent

design defect claim due to deviations from the PMA requirements because he "directly

challenge[d] the FDA-approved design for the X2 Pump," and therefore his claim was preempted

by the Medical Device Amendments ("MDA") to the federal Food, Drug, and Cosmetics Act

("FDCA"), 21 U.S.C. § 360c *et seq.* (March 2025 Decision 26–27.) By "construing the

Amended Complaint liberally," the Court found that Plaintiff "almost" pled a negligent design

claim that survived preemption based on the X2 Pump's failure to "comply with FDA design

failure modes as to droppage," (*id.* at 27 (quoting Am. Compl. ¶ 17)), but ultimately failed to

connect the alleged X2 Pump failure to a specific "PMA requirement that applied post-

approval," (*id.* at 28). The Court explained that for the allegations to survive preemption,

Plaintiff would have to sufficiently plead facts from which the Court could infer that the

requirements "set by the FDA as part of the pre-approval process" governed screenings for failure

modes that Defendant was required to conduct *after* receiving PMA for the X2 Pump to ensure

compliance with the FDA-approved design specifications. (*Id.* at 28–29 (emphasis added).) The

Court granted Plaintiff leave to replead his negligent defective design claim premised on failure to

---

[5] Plaintiff also submits as an attachment Decedent's X2 Pump Service Logs which is identical to Defendant's attachment. (*See* Decedent's X2 Pump Service Logs, annexed to Pl.'s SAC Opp'n as Ex. M, Docket Entry No. 42-13.) The Court references the Defendant's copy of the Decedent's X2 Pump Service Logs throughout this Memorandum and Opinion because it is a clearer scan of the same document and is easier to read.

    In addition, because the Decedent's X2 Pump Service Logs are not consecutively paginated, the Court refers to the page numbers assigned by the electronic case filing system.

comply with design failure modes and his wrongful death claim to the extent it is premised on the repleaded negligent defective design claim.[6]  (*Id.* at 39.)

### d.    Plaintiff's SAC claims: negligent defective design and wrongful death

Plaintiff alleges, first, a claim of negligent defective design for Defendant failing "to comply with the FDA PMA requirements, including having appropriate alerts and/or al[a]rms; to mitigate the known risks of the device through proper labeling and warnings per the PMA; and to warn consumers . . . of any defects . . . as they became known to Defendant."  (SAC ¶ 41.) Plaintiff alleges that the particular failure of Decedent's X2 Pump was due to "insufficient drive train force within the motor" that prevented the cartridge from administering insulin, but the X2 Pump did not log that pump malfunction, despite its classification "as a critical event during the PMA process and [therefore the malfunction was] required to be saved under [s]ection[s] M(5)(c) and M(5)(d)[7] of the subject pump's PMA application."  (*Id.* ¶ 33.)  According to Plaintiff, Defendant's design and subsequent manufacture of the X2 Pump violated "its obligations under relevant federal and state regulations governing the post-marked conduct of Class III infusion pumps, including the PMA requirements, as well as Defendant's duties under New York statutory and common law."  (*Id.* ¶ 35.)

Plaintiff also alleges that Defendant owed a duty to those who could be foreseeably injured by its products and that this duty includes "comply[ing] with the FDA PMA requirements, including having appropriate alerts and/or al[a]rms; to mitigate the known risks of the device

---

[6]  The Court dismissed with prejudice Plaintiff's negligent defective design claim premised on other alleged theories.  (March 2025 Decision 37–39.)

[7]  In the SAC, Plaintiff does not provide further information of sections M(5)(c) and (d). In his opposition, Plaintiff explains that the sections refer to sections M5(c) and (d) of the FDA's Summary of Safety and Effectiveness Data ("SSED") for the X2 Pump.  (Pl.'s SAC Opp'n 8, 12–13.)  The Court explains the SSED *infra* Section II.b.i.

6

through proper labeling," (*id.* ¶ 41), and that in breach of that duty, Defendant negligently designed the X2 Pump and failed to warn Decedent that there was a risk of "mechanical and/or pump malfunction wherein the cartridge would not load due to drive train failure or insufficiency," (*id.* ¶¶ 42–43). As a result of the negligent design, Plaintiff alleges that Defendant "direct[ly] and proximate[ly]" caused Decedent's death. (*Id.* ¶ 44.)

Second, Plaintiff asserts a claim for wrongful death of Decedent based on Defendant's negligent design defect and seeks compensation and general and special damages. (*Id.* ¶¶ 45–47.)

## II. Discussion

### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor." *Singh v. Deloitte LLP*, 123 F.4th 88, 93 (2d Cir. 2024) (quoting *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021)); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) ("[The Second Circuit] review[s] *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002))). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Yerkyn v. Yakovelich*, 164 F.4th 224, 231 (2d Cir. 2026) (quoting *id.*). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see Knapp v. Barclays PLC,* 171 F.4th 166, 170 (2d Cir. 2026) (quoting

*Iqbal*, 556 U.S. at 678); *Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (quoting *Matson*, 631 F.3d at 63); *see also Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 544 (2d Cir. 2024) ("[T]he plaintiff's allegations must enable the court to reasonably infer that the defendant is liable for the alleged misconduct"), *cert. denied sub nom.*, *NBA v. Salazar*, 146 S. Ct. 880 (2025); *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) ("[S]urviv[ing] a motion to dismiss . . . requires 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" (quoting *Iqbal*, 556 U.S. at 678)). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see Roe*, 91 F.4th at 651 ("Although all factual allegations contained in the complaint are assumed to be true, this rule does not extend 'to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" (quoting *Iqbal*, 556 U.S. at 678)).

### b. Express preemption of Plaintiff's negligent design claim

Defendant argues that Plaintiff's re-pled negligent design defect claim in the SAC still fails to satisfy pleading requirements and therefore is expressly preempted.[8] (Def.'s SAC Mem. 1–2.) First, Defendant contends that Plaintiff's allegation "that Defendant deviated from the design approved by the FDA during the PMA process by neglecting to include all of the requisite alerts/alarms — specifically for mechanical pump malfunction and drivetrain failure," is both insufficient to survive preemption and contradicted by the SAC. (Def.'s SAC Reply 4–7.)

---

[8] Defendant categorizes Plaintiff's negligent design claim into three defect theories — (1) compliance with failure modes; (2) durability; and (3) proper alarms and alerts — and argues that all three theories fail. (Def.'s SAC Mem. 10–13.) In his opposition, Plaintiff confirmed that he is not alleging a cause of action based on compliance with failure modes and durability as the Court decided these other issues in the March 2025 Decision. (Pl.'s SAC Opp'n 10–11.) Therefore, the Court only addresses Plaintiff's alleged theory that the X2 Pump's alarms and alerts constituted negligent design under applicable laws.

Second, Defendant argues that Plaintiff has failed to "follow the Court's detailed pleading roadmap" found within the March 2025 Decision — stating that "Plaintiff must allege facts from which the Court may infer that Defendant failed to comply with a PMA requirement 'set by the FDA as part of the pre-approval process governed screenings for failure modes that Defendant was required to conduct after receiving PMA . . . to ensure continued compliance with the FDA-approved design specifications.'" (Def.'s SAC Mem. 1 (quoting March 2025 Decision 27–28).) Specifically, Defendant contends that the SAC does not "identify any specific PMA requirement that applied post-approval" and Plaintiff's "interspers[al of] the phrase 'required by the PMA process' throughout the SAC[] that is much too generic to identify a violation of a *specific* PMA requirement, let alone one that applied post-approval." (*Id.* (emphasis added) (quoting SAC ¶ 16); *see id.* at 8–10; Def.'s SAC Reply 6.) Third, to the extent Plaintiff attempts to argue the design defects were inadequate because they deviated from the FDA's approved design elements "set by the FDA as part of the pre-approval process," Defendant contends the March 2025 Decision found those allegations to be deficient to state a claim. (*Id.* at 9, 10 (quoting March 2025 Decision 28).) Lastly, Defendant argues that "Plaintiff's allegations related to alerts and alarms bear no causal connection to the alleged injury and death at issue in the SAC" because "Plaintiff has not alleged how a differently phrased alarm . . . would have changed the outcome." (Def.'s SAC Reply 6–7.)

Plaintiff argues that his negligent design claim is not preempted because he has identified specific federal requirements that Defendant's design deviated from. (Pl.'s SAC Opp'n 10–14.) First, Plaintiff contends that the X2 Pump "deviated from the design that was approved by the FDA during the PMA process by neglecting to include all of the requisite alarms/alerts." (*Id.* at 12.) He argues that the PMA process includes a design requirement that the device store a record of critical events which must include device malfunctions which the X2 Pump failed to

sufficiently include.  (*Id.*)  Plaintiff contends that the alarm Decedent received, related to the cartridge, was different from the source of the malfunction that caused Decedent's death, related to the drive train within the pump.  (*Id.* at 12–13.)  "The true source of the malfunction, mechanical pump malfunction and drivetrain failure, was not registered or identified by the pump."  (*Id.* at 13.)  Therefore, this device malfunction evidences a violation of PMA requirements.  (*Id.* (quoting 21 C.F.R. § 820.30(a)(1)).)  Second, Plaintiff argues that the X2 Pump's failure to record the X2 Pump's malfunction, as described above, "illustrate[s] a violation of a post-approval requirement by the FDA."  (*Id.*)  Lastly, Plaintiff argues that he has sufficiently pled causation because the SAC alleges that the "inaccurate malfunction . . . resulted in [Decedent] being unable to respond to the malfunction or attempt to remedy it" which ultimately led to her death.[9]  (*Id.* at 14.)

Section 360k of the MDA to the FDCA, 21 U.S.C. § 360c *et seq.*, preempts any state law that imposes a requirement on a medical device that is "different from, or in addition to, any requirement" under the FDCA and "relates to the safety or effectiveness of the device."  21 U.S.C. § 360k(a); *Glover v. Bausch & Lomb Inc.*, 6 F.4th 229, 233 (2d Cir. 2021) (quoting *id.*). The Supreme Court has established a two-step analysis for assessing whether the MDA expressly preempts a state law.  *See Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008).  First, the court "must

---

[9]  Plaintiff and Defendant both make arguments regarding the insufficiency of any claim that Decedent's X2 Pump malfunctioned — but only "to the extent" the other party makes the argument.  (*See* Def.'s SAC Mem. 11 ("To the extent Plaintiff is attempting to allege that Decedent's device malfunctioned in that it did not sound an appropriate alarm, merely alleging a malfunction is insufficient."); Def.'s SAC Reply 5 ( "[Because] Plaintiff clearly admits that there was a malfunction of the pump after it was dropped and that an alarm notified [D]ecedent of such malfunction . . . [i]t is not clear what additional alarms or alerts Plaintiff expected the pump . . . to provide . . . ."); Pl.'s SAC Opp'n 13 ("To the extent Defendant attempts to argue that this amounts to a malfunction of the X2 Pump, rather than a defective design, this argument fails . . . .").)  As both parties agree that the Court previously disposed of any arguments that Decedent's X2 Pump malfunctioned, including in connection with the Decedent's dropping of it, in the March 2025 Decision, the Court does not address these arguments.

determine whether the Federal Government has established requirements applicable to [the device at issue]." *Id.* at 321.  "If so, [the court] must then determine whether the [plaintiff's] . . . claims are based upon [state] requirements with respect to the device that are 'different from, or in addition to,' the federal ones, and that relate to safety and effectiveness.'" *Id.* at 321–22 (quoting 21 U.S.C. § 360k(a)); *Wieder v. Advanced Bionics LLC* (*Wieder I*), No. 24-CV-8495, 2025 WL 3237257, at \*4 (S.D.N.Y. Nov. 20, 2025) (quoting *id.*), *report and recommendation adopted*, 2026 WL 880370 (S.D.N.Y. Mar. 31, 2026); *Koublani v. Cochlear Ltd.*, No. 20-CV-1741, 2021 WL 2577068, at \*5 (E.D.N.Y. June 23, 2021) (quoting same).  The Supreme Court also concluded that section 360k preempts state common law claims "assert[ing] that the device in question 'violated state tort law notwithstanding compliance with the relevant federal requirements'" because such claims "impose[] requirements in addition to those imposed by federal law."  *Glover*, 6 F.4th at 237 (quoting *Riegel*, 552 U.S. at 330).  However, the Supreme Court noted that section 360k "does not prevent a [s]tate from providing a damages remedy for claims premised on a violation of FDA regulations" when "the state duties in such a case 'parallel,' rather than add to, federal requirements."  *Riegel*, 552 U.S. at 330 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996)); *see also Glover*, 6 F.4th at 237 (quoting same); *Olmstead v. Bayer Corp.*, No. 17-CV-387, 2017 WL 3498696, at \*3 (N.D.N.Y. Aug. 15, 2017) ("[C]ommon law claims challenging the safety of an FDA-approved medical device may survive preemption only if they are 'premised on a violation of FDA regulations' where state law provides a damages remedy for such violations."  (quoting *Riegel*, 552 U.S. at 330)).  Such a "damages remedy does not amount to the additional or different 'requirement'" because "it merely provides another reason for manufacturers to comply with identical existing 'requirements' under federal law."  *Lohr*, 518 U.S. at 495; *see Otis-Wisher v. Medtronic, Inc.*, 616 F. App'x 433, 434 (2d Cir. 2015) ("[A] state law claim must be 'identical' to an existing

federal requirement for such a claim to survive § 360k preemption." (quoting *Lohr*, 518 U.S. at 495)); *Bertini v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 246, 252 (E.D.N.Y. 2014) ("To avoid imposing state requirements on a device manufacturer which are in addition to or different from federal requirements, a plaintiff must establish that the state and federal requirements are equivalent.").[10]

There is no controlling authority prescribing the details required to plead a parallel claim that avoids preemption, but district courts within the Second Circuit have required that plaintiffs cite to a federal requirement specific to the device at issue that was violated and allege facts sufficient to link the violation to the alleged injury. *See Crissi v. Johnson & Johnson Vision Care, Inc.*, No. 15-CV-4230, 2016 WL 4502038, at *2 (E.D.N.Y. Aug. 25, 2016) ("[T]o survive preemption, claims must set forth a specific problem with or violation of federal law, be specific to the subject device and link that violation to the alleged injury."); *Burkett v. Smith & Nephew Gmbh*, No. 12-CV-4895, 2014 WL 1315315, at *4 (E.D.N.Y. Mar. 31, 2014) (finding that "none of [the plaintiff's] claims state[d] a parallel claim because each fail[ed] (1) to allege a violation of federal law that is specific to the device at issue . . . and/or (2) to tie the alleged violation to [the plaintiff's] purported injuries"); *Gale v. Smith & Nephew, Inc.*, 989 F. Supp. 2d 243, 249 (S.D.N.Y. 2013) ("[T]o state a parallel claim plaintiff must 'set forth facts pointing to specific [premarket approval] requirements that have been violated,' and link those violations to his injuries." (second alteration in original) (first quoting *Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1301 (11th Cir. 2011); and then citing *Desabio v. Howmedica Osteonics Corp.*, 817

---

[10]   State laws not expressly preempted by the MDA may nevertheless be impliedly preempted under section 337(a) of the FDCA, which provides that "all . . . proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States.'" *Glover v. Bausch & Lomb Inc.*, 6 F.4th 229, 237 (2d Cir. 2021) (alterations in original) (quoting 21 U.S.C. § 337(a)).  Because this motion to dismiss only involves express preemption, the Court does not address implied preemption.

F. Supp. 2d 197, 204 (W.D.N.Y. 2011))); *see also Tansey v. Cochlear Ltd.*, No. 13-CV-4628, 2014 WL 4829453, at \*9 (E.D.N.Y. Sep. 26, 2014) (quoting *Gale*, 989 F. Supp. 2d at 249).

"Under New York law . . . a plaintiff can assert claims for injury due to an allegedly defective product under theories of negligence [and other theories]." *Delgado v. Universal Beauty Prods., Inc.*, No. 22-2727, 2024 WL 1298509, at \*1 (2d Cir. Mar. 27, 2024) (summary order). "In New York, to establish a design defect, a plaintiff must 'present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner.'" *In re Sears Holdings Corp.*, No. 21-1095, 2023 WL 3938982, at \*1 (2d Cir. June 12, 2023) (summary order) (quoting *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 108 (1983)); *Michael v. Gen. Motors LLC*, 790 F. App'x 275, 277 n.1 (2d Cir. 2019) (quoting same). In addition, "to establish a prima facie case, the plaintiff is required to show that the defectively designed product caused his injury and that the defect was the proximate cause of the injury." *In re Sears*, 2023 WL 3938982, at \*1 (first quoting *Voss*, 59 N.Y.2d at 109; and then citing *Doomes v. Best Transit Corp.*, 17 N.Y.3d 594, 608 (2011)). The plaintiff bears the burden of showing "that a defect in the product was a substantial factor in causing the injury." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 86 (2d Cir. 2006) (emphasis omitted) (quoting *Fritz v. White Consol. Indus., Inc.*, 762 N.Y.S.2d 711, 714 (App. Div. 2003)). "[T]he relevant inquiry is whether the product as designed was not reasonably safe — that is, whether it is a product which, if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *DiBartlo v. Abbott Lab'ys*, 914 F. Supp. 2d 601, 621 (S.D.N.Y. 2012) (citation and internal quotation marks omitted).

13

### i.    Deviation from PMA approved requirements

Defendant argues, first, that Plaintiff's allegation that the Decedent's X2 Pump "deviated from the design approved by the FDA during the PMA process by neglecting to include all of the requisite alerts/alarms — specifically for mechanical pump malfunction and drivetrain failure" fails because of its contradictions to the allegations in the SAC that the Decedent did in fact receive a malfunction alarm.  (Def.'s SAC Reply 4.)  In addition, Defendant argues that "[w]hen stripp[ing the SAC] of its generic allegations of how the pump failed to comply with 'PMA requirements,' the SAC reveals that the X2 Pump, in fact, operated as intended and approved by the FDA."  (*Id.*)  Plaintiff alleges that "alarms are required to be built into insulin pumps . . . by the FDA as part of the PMA process to notify the user . . . of certain failures of the pump, including mechanical malfunctions and failures, such as a drive train failure."  (*Id.* (emphasis omitted) (quoting SAC ¶ 15).)  In contrast, Plaintiff later admits that the "cartridge on [D]ecedent's pump 'was not loading . . . due to mechanical malfunctions . . . including . . . drive train failure,'" "that, after receiving the alarm, [D]ecedent called [customer support]," and Defendant's report found the "'cause of the alarm . . . was due to insufficient drive train force,' triggered by the motor not moving and the need for a new cartridge."  (*Id.* at 5 (alterations in original) (quoting SAC ¶¶ 17, 20, 21, 32–33).)  Ultimately, "[t]he pump recognized [the] malfunction and issued an alarm, which notified the pump user and, for the user's safety, suspended all insulin deliveries until the malfunction could be addressed."  (*Id.*)  Second, as Plaintiff does not dispute that the X2 Pump had and sounded an alarm to Decedent, Defendant contends that Plaintiff fails to explain "what additional alarms or alerts Plaintiff expected the pump, at that point in time, to provide or, more importantly, how such alarms would have changed the outcome — [D]ecedent's death."  (*Id.*)  Defendant contends that "[m]erely alleging the X2 Pump was defective because it sounded an alarm for cartridge failure instead of some

14

other malfunction is insufficient, particularly when Plaintiff fails to specify which additional alarms were required by the FDA in the PMA process." (*Id.* at 5–6.) Lastly, Defendant argues that Plaintiff is ultimately "merely challenging the X2 Pump's alerts and alarms approved by FDA during the pre-approval process by alleging the X2 Pump should have included alarms for drive train failure and insufficient drive train" — which is "clearly preempted," both under case law and the March 2025 Decision. (Def.'s SAC Mem. 11.)

Plaintiff argues first that the FDA's PMA process ensured that the X2 Pump included various design requirements, such as keeping a record of critical events stored which lists device malfunctions and alarms and alerts. (Pl.'s SAC Opp'n 12–13.) In addition, Plaintiff argues that when "the only error/malfunction event that was recorded was the Cartridge Alarm 20,"[11] and

---

[11] Plaintiff attempts to broadly argue that the user guide "indicates that the X2 Pump is not designed with *any alert or alarm* that would notify the user or the manufacturer of *any mechanical malfunctions or failures*, such as the one that occurred here." (Pl.'s SAC Opp'n 13 (emphasis added).) However, Plaintiff's statement is contradicted by the allegations in the SAC which state that Plaintiff acknowledges that the Decedent did in fact receive a mechanical malfunction or failure alarm, just not the "drive train failure" alarm Plaintiff contends should have been included. (*See* SAC ¶ 20 ("[Decedent] received a warning message from the insulin pump, 'Alarm 20 / cartridge alarm,' indicating the following 'ALL DELIVERIES STOPPED! This cartridge cannot be used. Remove and replace with a new cartridge.'").) In addition, the allegations in the SAC are consistent with Decedent's X2 Pump Service Logs, which Plaintiff submitted in support of his opposition and is directly referenced in the SAC. (Decedent's X2 Pump Service Logs 8, 11; *see* SAC ¶ 32.) Therefore, the Court disregards Plaintiff's claim that the X2 Pump was "not designed with *any alert or alarm* that would notify the user or the manufacturer of *any mechanical malfunctions or failures*." (Pl.'s SAC Opp'n 13 (emphasis added).) *See Azzarmi v. Key Food Stores Co-Operative Inc.*, No. 20-CV-6835, 2022 WL 884973, at *5 (S.D.N.Y. Mar. 25, 2022) ("[T]he court need not accept allegations that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint, nor can a plaintiff invent factual allegations that [the plaintiff] has not pled [in the complaint]." (alterations in original) (internal citations and quotation marks)); *Optima Media Grp. Ltd. v. Bloomberg L.P.*, 383 F. Supp. 3d 135, 143 n.1 (S.D.N.Y. 2019) ("[T]he [c]ourt will not credit unpled allegations made in a party's brief."); *Sara Designs, Inc. v. A Classic Time Watch Co.*, 234 F. Supp. 3d 548, 556 n.2 (S.D.N.Y. 2017) ("It goes without saying that a [c]ourt does not consider assertions contained in briefs that are not pleaded in the [c]omplaint."); *Faggionato v. Lerner*, 500 F. Supp. 2d 237, 248 (S.D.N.Y. 2007) ("This new

not a "mechanical pump malfunction and drivetrain failure,"[12] the "true source of the malfunction . . . was not registered or identified by the pump." (*Id.* at 13.) Plaintiff contends that this "device malfunction" was a critical event required by the FDA to be recorded in the X2 Pump's design and a failure to do so evidences a violation of PMA's requirements. (*Id.*) Therefore, the X2 Pump "deviated from the design that was approved by the FDA during the PMA process by neglecting to include all of the requisite alarms/alerts." (*Id.* at 12.) Second, Plaintiff argues this design deviation was also in violation of 21 C.F.R. § 820.30(a)(1) which requires that "any manufacturer of any class III or class II device . . . shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met." (*Id.* at 13 (alteration in original) (quoting 21 C.F.R. § 820.30(a)(1)).) For both reasons, Plaintiff contends his negligent design claim is not preempted.

"[S]tate requirements are pre-empted only when the FDA has established specific counterpart regulations or there are other specific requirements applicable to a particular device under federal law." *Riegel*, 552 U.S. at 322–23 (internal quotation marks omitted) (citing *Lohr*, 518 U.S. 470). "[O]nce a device has obtained PMA approval, the manufacturer cannot make any changes . . . without further FDA approval . . . [as] the device is clearly subject to the federal, device-specific requirement of adhering to the standards contained in its individual, federally approved PMA." *Riegel v. Medtronic, Inc.* (*Riegel II*), 451 F.3d 104, 118 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008); *see Riegel*, 552 U.S. at 323 ("[T]he FDA requires that a device that has received premarket approval be made with almost no deviations from the

---

theory, however, was not pled in the [c]omplaint, and, of course, the [c]ourt need not accept assertions contained in [the plaintiff's] briefs.").

[12] Plaintiff and Defendant agree that the X2 Pump's user guide does not include any alarm or alert involving a "drive train failure or insufficient drive train." (Pl.'s SAC Opp'n 13; Def.'s SAC Mem. 12.)

specifications in the device's approval application, for the reason that the FDA has determined that the approved form provides a reasonable assurance of safety and effectiveness." (citing *Lohr*, 518 U.S. at 493)). "[T]ort claims that are premised on a manufacturer's deviation from the standards set forth in the device's approved PMA application . . . are in no way preempted. Only those claims that allege liability despite a PMA-approved device's adherence to these standards . . . are preempted." *Riegel II*, 451 F.3d at 123–24; *McConologue v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 93, 105 (D. Conn. 2014) (collecting cases) ("Where a plaintiff claims that an approved Class III device has violated its own premarket approval standards, state law claims based on such a violation are not preempted under [section] 360k as long as they are parallel claims." (citing *Riegel*, 552 U.S. at 330)); *cf. McConologue*, 8 F. Supp. 3d at 102 ("[S]tate law claims challenging the safety and efficacy of an FDA approved Class III device which has complied with its premarket approval requirements are preempted . . . as they would be different from or in addition to federal requirements provided by the [PMA] process."). "[A] plaintiff bears the burden of alleging deviations from those safety standards in order to avoid preemption and assert state tort-law causes of action." *McConologue*, 8 F. Supp. 3d at 105 (citing *Riegel*, 552 U.S. at 322–23). "[D]istrict courts in this Circuit have repeatedly stated that a plaintiff cannot simply incant the magic words [the defendants] violated FDA regulations in order to avoid preemption." *Babayev v. Medtronic, Inc.*, 228 F. Supp. 3d 192, 215 (E.D.N.Y. 2017) (second alteration in original) (citations and internal quotation marks omitted).

First, the allegations in the SAC does not refer to any "device-specific" PMA requirement but instead attempts to remedy the deficiencies identified in the March 2025 Decision by including general phrases such as "mechanical issues . . . identified by the FDA during the PMA process for the subject pump" and "alarms [ ] required . . . by the FDA as a part of the PMA process." (SAC ¶¶ 13, 15; *see id.* ¶¶ 16–18, 41, 43.) As explained in the March 2025 Decision,

such general conclusory statements are insufficient. *See Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 403 (S.D.N.Y. Dec. 3, 2013) ("To avoid preemption and satisfy the *Twombly* and *Iqbal* pleading standards, plaintiffs suing with regard to a PMA-approved device cannot simply make the conclusory allegation that defendant's conduct violated FDA regulations."); *Gelber v. Stryker Corp.*, 788 F. Supp. 2d 145, 155 (S.D.N.Y. 2011) ("Plaintiffs cannot simply incant the magic words [the defendant] violated FDA regulations in order to avoid preemption." (quoting *In re Medtronic*, 592 F. Supp. 2d 1147, 1158 (D. Minn. 2009), *aff'd* 623 F.3d 1200 (8th Cir. 2010))); *see also Wieder I*, 2025 WL 3237257, at *6 (quoting *Gelber*, 788 F. Supp. 2d at 155); *Croci v. Zoll Medical Corp.*, No. 24-CV-2137, 2025 WL 2307728, at *5 (S.D.N.Y. Aug. 11, 2025) (quoting *Simon*, 990 F. Supp. 2d at 403); *Sheinfeld v. B. Braun Medical Inc.*, No. 23-CV-1622, 2024 WL 3996014, at *4 (S.D.N.Y. Aug. 27, 2024) (collecting cases), *report and recommendation adopted*, 2024 WL 4663038 (S.D.N.Y. Nov. 4, 2024); *Desabio*, 817 F. Supp. 2d at 203–04 (finding the plaintiff's second amended complaint, which added an allegation that the alleged "impurity, imperfection and or other product defects were a deviation from the [d]efendants' design and quality manufacturing standards for the [subject device] approved by the FDA," was insufficient to survive dismissal because the new allegations were too "vague" and "general" (second alteration in original)).

Second, Plaintiff, in his opposition brief, relies on sections M5(c) and (d) of the FDA's SSED for the X2 Pump[13] to argue that the FDA requires the X2 Pump to record device

---

[13]  (Summary of SSED, annexed to Pl.'s SAC Opp'n as Ex. L, Docket No. 42-12.)  The SSED is an FDA document that summarizes the key content of the PMA, such as the Device Description, Preclinical Evidence, and Clinical Evidence, as well as FDA's analysis of the scientific evidence that served as the basis for FDA's decision regarding the reasonable assurance of the safety and effectiveness of the device."  Premarket Approval (PMA) Application Contents: Summary of Safety and Effectiveness Data (§ 814.44), U.S. FOOD & DRUG ADMIN., https://www.fda.gov/medical-devices/premarket-approval-pma/pma-application-contents#ssed (last visited Apr. 17, 2026).

18

malfunctions, such as the mechanical pump malfunction and drive train failure, and ultimately alert the user of such failures.[14] (Pl.'s SAC Opp'n 12–13.) Plaintiff contends that Decedent's X2 Pump only recorded "Alarm 20 / cartridge alarm" which alerted Decedent that "ALL DELIVERIES STOPPED! This cartridge cannot be used. Remove and replace with a new cartridge," — instead of recording the "true source of the malfunction." (*Id.* (quoting SAC ¶ 20).) Plaintiff contends that because Defendant deviated from this PMA "approved design," Decedent received inaccurate malfunction information, resulting in her death. (*Id.* at 14.)

The relevant parts of SSED section 5 provide:

> The device design must ensure that a record of critical events is stored and accessible for an adequate period . . . . Critical events to be stored by the system must, at a minimum, include: . . . (c) Device malfunctions [and] (d) Alarms and alerts and associate acknowledgments.

(SSED sections M5(c) and (d).) Plaintiff's citation to this provision appears to be an effort to remedy the deficiency identified in the March 2025 Decision, (March 2025 Decision 26–27), by

---

[14] Because Plaintiff does not identify the SSED or any other specific PMA requirements in the SAC, the Court is not required to rely on the factual allegations only included by Plaintiff in his opposition brief. "A district court errs when it . . . relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss." *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (citing *Fonte v. Bd. of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir. 1988)); *see Blumstein-Torrella v. N.Y.C. Dep't of Educ.*, No. 19-CV-3492, 2023 WL 5097873, at *5 (S.D.N.Y. Aug. 9, 2023) ("[A] plaintiff cannot rely on factual assertions and allegations that appear for the first time in her opposition to the motion to dismiss and which are not plead."); *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 585 (S.D.N.Y. 2022) ("A district court [ ] 'errs when it . . . relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.'" (quoting *Friedl*, 210 F.3d at 83–84)); *see also Colliton v. Bunt*, 709 F. App'x 82, 83 (2d Cir. Jan. 16, 2018) ("[G]enerally, courts cannot consider new factual assertions in an affidavit submitted in opposition to a motion to dismiss."); *In re Petrobras Secs. Litig.*, No. 14-CV-9662, 2016 WL 11671141, at *3 (S.D.N.Y. Mar. 25, 2016) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss," and declining to consider information in the plaintiff's exhibits to an affidavit submitted in opposition to the motion to dismiss. (citation omitted)).

To the extent, however, that it could be determined that the SAC's allegations "refer" to these later-identified requirements, the Court considers the SSED's section.

19

specifying a "device-specific federal requirement" that the X2 Pump's design allegedly deviated from.  However, Plaintiff's argument is a failed attempt to disguise a deficient claim of deviation because Plaintiff's actual disagreement involves the X2 Pump's approved design.  The Court is not persuaded by Plaintiff's contention that the X2 Pump's inclusion of the drive train failure alarm is a deviation from the PMA-approved design, instead of a direct challenge to the PMA-approved design.  Plaintiff's issue about the X2 Pump's functionality involves the sufficiency of the X2 Pump's log and the type of critical events logged and alarms the device recorded.  As explained *supra* footnote 12, Plaintiff and Defendant agree that the X2 Pump's user guide does not include any alarm or alert involving "drive train failure or insufficient drive train," (Pl.'s SAC Opp'n 13; Def.'s SAC Mem. 12), nor do the parties dispute that Decedent received a cartridge failure alarm, (Pl.'s SAC Opp'n 12; Def.'s SAC Mem. 3; *see* SAC ¶ 33; Decedent's X2 Pump Service Logs 8, 11).  The FDA approved critical event logging and alarms the X2 Pump included, but Plaintiff still argues that the device's design should have included a specific alarm for a "drive train failure or insufficient drive train" mechanical malfunction.  These types of claims that challenge the FDA's PMA approved design are preempted.  *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 86 (2008) (discussing the Supreme Court's decision in *Riegel* which found "[t]he plaintiffs' products liability claims fell within the core of the MDA's pre-emption provision because they sought to impose different requirements on precisely those aspects of the device that the FDA had approved"); *Croci*, 2025 WL 2307728, at *7 (finding the plaintiff's design defect claims based on negligence were expressly preempted because his "claims essentially challenge the FDA's judgment regarding the safety of [the subject device's] design, thereby seeking to impose requirements that differ from, or in addition to, those approved by the agency"); *Tansey*, 2014 WL 4829453, at *11 (finding the plaintiff's design defect claims preempted because "such claims challenge the PMA approval of the design for the [subject

20

device]"); *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 284 (E.D.N.Y. 2009) (finding the

plaintiff's design defect claim was preempted because it "challenge[d] the FDA's findings

concerning the safety of the [subject device]'s design" and "necessarily impose[d] requirements

that are different from, or in addition to, federal regulations").

Moreover, it is also unclear to the Court how the alarm the Decedent received, relating to

a cartridge failure ultimately connected to the pump's malfunction, differs from the alarm

Plaintiff alleges should have been included, relating specifically to "drive train failure" or a

"mechanical pump malfunction."  In other words, the allegations in the SAC and Plaintiff's

briefing fail to explain how the alert Decedent received was in fact a "deviation" from the PMA

requirements.  Plaintiff admits the Decedent received a device malfunction alarm relating to the

cartridge and ultimately the pump's function.  (Pl.'s SAC Opp'n 12; Def.'s SAC Mem. 3; *see*

SAC ¶ 33; Decedent's X2 Pump Service Logs 8, 11.)  *See Dains v. Bayer HealthCare LLC*, No.

22-CV-208, 2022 WL 16572021, at *7 (N.D.N.Y. Nov. 1, 2022) (finding the "[p]laintiff has not

plausibly alleged facts suggesting that [the d]efendants deviated from the FDA-approved design

for the [subject] device, a necessary prerequisite to avoiding express preemption"); *cf. Rosen v.*

*St. Jude Med., Inc.*, 41 F. Supp. 3d 170, 181 (N.D.N.Y. 2014) (concluding that a claim alleging

that the defendant violated PMA requirements satisfies *Twombly* as long as it is "supported by

sufficient factual evidence of the violation").

Lastly, Plaintiff contends that "Defendant's design and subsequent manufacture of the

[X2 Pump] violated" 21 C.F.R. §§ 820.30(a), 820.30(c), 820.100, and 820.186.  (Pl.'s SAC

Opp'n 9; SAC ¶ 36.)  As explained in the March 2025 Decision, "[p]art 820 of Title 21 of the

[C.F.R.] encompasses FDA's Current Good Manufacturing Practices (CGMP), 'which establish

general requirements for most steps in every device's manufacture,'" (March 2025 Decision 20

(first quoting *Lohr*, 518 U.S. at 483; and then citing 21 C.F.R. § 820.1(a)(1))), and "[c]ourts are

divided as to whether an alleged violation of the generally applicable requirements of CGMPs is alone a sufficient basis for a parallel claim to survive preemption," (*id.*). "Most courts addressing the issue in the Eastern District of New York have concluded that CGMPs do not form a sufficient basis for a parallel claim,[15] and courts that have allowed such claims to proceed have done so only when the alleged CGMP violation also gives rise to a violation of PMA requirements.[16] (*Id.* at 21.)

The relevant provisions include: (1) 21 C.F.R. § 820.30(a)(1) which requires that "[e]ach manufacturer of any class III or class II device . . . shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met";

---

[15] *See, e.g.*, *Babayev v. Medtronic, Inc.*, 228 F. Supp. 3d 192, 218–20 (E.D.N.Y. 2017) (device manufacturer's alleged CGMP violations did not support a parallel claim because the "vague and open-ended" CGMPs "do not impose specific duties" and "state-law claims premised on a violation of" them may create "varying standards that would be 'different from, or in addition to' those required by the federal scheme" (citations omitted)); *Pearsall v. Medtronics, Inc.*, 147 F. Supp. 3d 188, 197–98 (E.D.N.Y. 2015) (device manufacturer's alleged violation of the CGMPs' "minimum standards" cannot substantiate a parallel claim because "CGMPs are guidelines that do not create a federal requirement, . . . a claim based on alleged failure to comply with the guidelines fails to plead violation of a federal requirement[,]" and [t]o permit a claim that mandates compliance with such 'vague' standards effectively imposes 'different, or additional' requirements" (citations omitted)); *Burkett v. Smith & Nephew Gmbh*, No. 12-CV-4895, 2014 WL 1315315, at *5 (E.D.N.Y. Mar. 31, 2014) ("Because [plaintiff's] manufacturing defect claim is based on violation of generally applicable CGMPs, as opposed to federal requirements specific to the [medical device at issue], preemption bars the claim.").

[16] *See, e.g.*, *Tansey v. Cochlear Ltd.*, No. 13-CV-4628, 2014 WL 4829453, at *10 (E.D.N.Y. Sep. 26, 2014) (quoting *Franzese v. St. Jude Med., Inc.*, No. 13-CV-3203, 2014 WL 2863087, at *5 (E.D.N.Y. June 23, 2014), and concluding that plaintiff's allegations that a device manufacturer violated CGMPs regarding production and process controls, 21 C.F.R. §§ 820.70(a),(h), gave rise to federal violations sufficient to state a parallel claim because the "complaint allege[d] that [the manufacturer] deviated from the FDA approved plan and specifications and that the deviation . . . was the cause of plaintiff's injury"); *Franzese*, 2014 WL 2863087, at *4–5 (concluding that the allegation that a device manufacturer's "unsanctioned adulterations" due in part to a failure to comply with CGMP process validations requirements could state a parallel claim "where the violation of CGMPs also indicate a deviation from PMA requirements").

22

(2) 21 C.F.R. § 820.30(c) which requires that "[e]ach manufacturer shall establish and maintain procedures to ensure that the design requirements relating to a device are appropriate and address the intended use of the device"; (3) 21 C.F.R. § 820.100(a) which requires that "[e]ach manufacturer shall establish and maintain procedures for implementing corrective and preventive action"; and (4) 21 C.F.R. § 820.186 which requires that "[e]ach manufacturer shall maintain a quality system record . . . [that] include[s] . . . procedures and the documentation of activities required by this part that are not specific to a particular type of device."  Even if the Court were to assume without deciding that CGPMs may substantiate a parallel claim, Plaintiff has failed to satisfy his pleading burden.

First, neither the allegations in the SAC nor in Plaintiff's briefing elaborate on how Decedent's X2 Pump's design failure to log a "mechanical pump malfunction and/or drive train failure" constitutes Defendant's failure to comply with the other CGPM provisions. *See Wieder v. Advanced Bionics LLC* (*Wieder II*), No. 24-CV-8495, 2026 WL 880370, at *3 (S.D.N.Y. Mar. 31, 2026) ("[M]erely saying that there was no quality control is [ ] insufficient to establish a violation [of CGMP requirements].").  Second, Plaintiff's conclusory statements that the alleged "device malfunction," involving a "requisite alert [that] did not occur and was not recorded," "evidences a violation of 21 C.F.R. § 820.30(a)(1)," (Pl.'s SAC Opp'n 13), and, generally, that "Defendant's design [of the X2 Pump] . . . violated 21 C.F.R. §§ 820.30(c), 820.100 [sic], and 820.186," (SAC ¶ 36), are insufficient. *See Wieder I*, 2025 WL 3237257, at *6 ("While plaintiffs advert to specific CGMP requirements, merely repeating those requirements and alleging they were violated is insufficient." (internal citation omitted)); *Ilarraza v. Medtronic, Inc.*, 677 F. Supp. 2d 582, 588 (E.D.N.Y. 2009) ("Where, as here, the plaintiff has done nothing more than recite unsupported violations of general regulations, and fails to tie such allegations to the injuries alleged, the complaint is properly dismissed.").  Third, Plaintiff still does not allege that

23

the FDA imposed the CGMPs on the X2 Pump through the PMA process.  (*See* March 2025 Decision 19–22.)  *See Olmstead*, 2017 WL 3498696, at \*4 (holding that "allowing a suit to continue on the basis of [violating] [21 C.F.R. § 820.1 *et. seq.*] would necessarily impose standards that are different from, or in addition to those imposed by the MDA — precisely the result that the MDA preemption provision seeks to prevent"); *Tansey*, 2014 WL 4829453, at \*9 ("To avoid preemption and satisfy the *Twombly* and *Iqbal* pleading standards, plaintiffs suing with regard to a PMA-approved device cannot simply make the conclusory allegation that defendant's conduct violated FDA regulations." (quoting *Simon*, 990 F. Supp. 2d at 403)).  Lastly, Plaintiff attempts to tie his alleged PMA violation to a CGMP violation, arguing that Defendant violated CGMPs because it violated the PMA, but as explained *supra*, the Court finds that Plaintiff has failed to plead a non-exempted claim for defective design.

Accordingly, Plaintiff's negligent design claim is preempted because Plaintiff has failed to sufficiently plead a violation of "device-specific" PMA requirements.

### ii.    Plaintiff fails to plead a post-approval requirement

Defendant first argues that Plaintiff has failed to "follow the Court's detailed pleading roadmap" found within the March 2025 Decision and allege "how the X2 Pump's design violated a federal requirement for design failure mode screening that applied post-approval." (Def.'s SAC Mem. 1, 8.)  Instead, Defendant contends that Plaintiff merely repleads a negligent design defect claim that is preempted because Plaintiff "fails to allege a correlated specific PMA requirement that applied post-approval." (*Id.* at 9.)  Second, Defendant argues that with respect to Plaintiff's allegations of improper alarms and alerts for drive train failure and insufficient drive train force, Plaintiff "[m]erely add[s] the phrase 'as required by the FDA PMA process'" and "[t]he 'PMA process' is not a specific PMA requirement" that meets the standard set forth in the March 2025 Decision to overcome preemption.  (*Id.* at 11–12; *see* Def.'s SAC Reply 5–6.)

24

Finally, Defendant argues that Plaintiff fails to identify a specific post-approval requirement set by the FDA related to the X2 Pump device log, and at most, "the absence of some notation of a drive train malfunction on the device log is [ ] mere evidence of a malfunction, not a breach of a federal requirement." (Def.'s SAC Reply 6.)

Plaintiff contends that he sufficiently identified a specific "post-approval requirement by the FDA" for the X2 Pump that Defendant's design deviated from including (1) sections M5(c) and (d) of the PMA which required the device to include a "record of critical events" including "device malfunctions" and "[a]larms and alerts and associates acknowledgements," (Pl.'s SAC Opp'n 12–13 (first citing SAC ¶¶ 15, 16, 18; and then citing SSED 47–48)), and (2) 21 C.F.R. § 820.30(a)(1), a CGMP, which requires that "any manufacturer of any class III or class II device . . . shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met,"[17] (id. at 13 (alteration in original) (citing SAC ¶¶ 36, 39)). Plaintiff argues that the mechanical pump malfunction and/or drivetrain failure of Decedent's X2 Pump qualified as a "device malfunction" that required recording "by the FDA" in the X2 Pump's design. (Id.)

Plaintiff fails to plead a PMA requirement or other specific federal requirements that applied post-approval to the X2 Pump's design that Defendant failed to comply with. First, Plaintiff contends without support that the PMA requirements in the SSED that require a "record

---

[17] While Plaintiff also contends generally that Defendant's design and subsequent manufacture of the X2 Pump violated 21 C.F.R. §§ 820.100 and 820.186, two other CGMPs, Plaintiff neither provides specifics nor explains how those statutes apply post-approval to the X2 Pump or how Defendant violated them. (See Pl.'s SAC Opp'n 9.) As discussed *supra*, Plaintiff's allegations of CGMP violations with regard to deviation from the PMA fail because Plaintiff does not explain how Decedent's X2 Pump's design failure to log a pump malfunction constitutes Defendant's failure to comply with the CGPM provisions, Plaintiff makes conclusory statements alleging Defendant violated CGMPs, and Plaintiff does not allege that the FDA imposed the CGMPs on the X2 Pump through the PMA process. *See supra* Section II.b.i.

25

of critical events" to include "device malfunctions" are "post-approval requirement[s]." (*See* Pl.'s SAC Opp'n 12–13.) In his opposition, Plaintiff discusses the PMA process generally and only cites to a section of the SSED, but fails to cite to the PMA approval order which provided the "[p]ost-approval [r]equirements and [r]estrictions," (SSED 28). (Pl.'s SAC Opp'n 12–13.) Instead, Plaintiff only states in a conclusory manner that Defendant's actions "illustrate a violation of a post-approval requirement by the FDA." (*Id.* at 13.) Plaintiff repeats the same mistake identified in the March 2025 Decision. As in the March 2025 Decision where the Court determined that Plaintiff's negligent design claim was preempted because "Plaintiff's allegation that Defendant failed to comply with failure modes set by the FDA as part of the pre-approval process challenge[d] the sufficiency of the failure mode testing that the FDA found to be adequate to approve the X2 Pump's design," (March 2025 Decision 29), Plaintiff now challenges the sufficiency of the X2 Pump design approved by the FDA by pointing to a general statement in the PMA regarding critical event storage without indicating its post-approval application. Therefore, Plaintiff's claim is again expressly preempted. *See, e.g.*, *Bertini*, 8 F. Supp. 3d at 254 ("[A]n action based on state law that would require a manufacturer to design a device, which has already received PMA approval, in a manner that is safer than what the FDA requires would impose additional state safety requirements on the device, and therefore this claim would be preempted under § 360k."); *Simon*, 990 F. Supp. 2d at 405 ("Design defect claims regarding a PMA-approved device are squarely preempted by the MDA.").

Second, Plaintiff similarly fails to plead a different post-approval requirement that Defendant failed to comply with. Plaintiff cites to generally applicable federal statutes, CGMPs, that are not device-specific, Plaintiff does not allege that the CGMPs applied to the X2 Pump post-PMA approval, and Plaintiff does not specify how Defendant's post-PMA approval actions violated the CGMPs. (*See* Pl.'s SAC Opp'n 13 ("Not only does this illustrate a violation of a

26

post-approval requirement by the FDA, this also evidences a violation of 21 C.F.R §

820.30(a)(1) . . . .").)

The Court compares Plaintiff's CGMP post-approval violation allegations in the SAC to

the plaintiff's allegations in *Burkett v. Smith & Nephew Gmbh.* In *Burkett*, the plaintiff alleged

the defendant's defective manufacture of its Class III medical device violated post-PMA

requirements, "namely, those laws applicable to post-approval surveillance and manufacturing,

specifically the CGMPs" including 21 C.F.R. §§ 820.100 and 820.30, after the defendant issued

a recall of the device, which required the defendant to report the design and manufacture changes

to the FDA for review and approval, and the device received a subsequent FDA approval via a

supplemental PMA process. *Burkett*, 2014 WL 1315315, at *1–4; Am. Compl. ¶¶ 46, 51,

*Burkett*, No. 12-CV-4895. The court in *Burkett* held that preemption barred the plaintiff's claim

because she failed to "allege a violation of federal requirements specific to the . . . the device at

issue," and she also failed to link the violation to her injuries. *Burkett*, 2014 WL 1315315, at *4–

6. Like in *Burkett*, Plaintiff in this case alleges the X2 Pump violated generally applicable

CGMPs, as opposed to federal requirements specific to the X2 Pump. (*See* Pl.'s SAC Opp'n 13.)

Plaintiff argues broadly in his opposition that Defendant failed to "establish and maintain

procedures to control the design of [the X2 Pump] in order to ensure that specified design

requirements are met" under 21 C.F.R. § 820.30(a)(1), (*id.* at 13), and states in conclusory

fashion that Defendant "violated" 21 C.F.R. §§ 820.30(a), 820.100, and 820.186, (*id.* at 9; SAC ¶

36). Further, Plaintiff does not allege that the CGMPs include post-approval requirements or that

the FDA imposed the CGMPs on the X2 Pump through the PMA process. Unlike *Burkett*,

Defendant in this case did not make a post-PMA change to the X2 Pump that required a

supplemental PMA process and therefore engagement with the post-approval requirements

regarding reporting changes of design specifications to the FDA. *See Burkett*, 2014 WL

27

1315315, at \*3.  Plaintiff only points to alleged deviations from FDA-approved requirements and general CGMPs as "post-approval," but, as discussed *supra*, preemption bars those claims.  (*See supra* Section II.b.i (explaining that courts in the "Eastern District of New York have concluded that CGMPs do not form a sufficient basis for a parallel claim, and courts that have allowed such claims to proceed have done so only when the alleged CGMP violation also gives rise to a violation of PMA requirements" (quoting March 2025 Decision 21)).)  Plaintiff's vague allegations do not specify how the requirements apply to the X2 Pump post-approval, and are therefore insufficient.  *See Tansey*, 2014 WL 4829453, at \*9 ("To avoid preemption and satisfy the *Twombly* and *Iqbal* pleading standards, plaintiffs suing with regard to a PMA-approved device cannot simply make the conclusory allegation that defendant's conduct violated FDA regulations." (quoting *Simon*, 990 F. Supp. 2d at 403)).

### iii.    Causation

Defendant argues that "Plaintiff's allegations related to alerts and alarms bear no causal connection to the alleged injury and death at issue in the SAC" because "Plaintiff has not alleged how a differently phrased alarm . . . would have changed the outcome."  (Def.'s SAC Reply 6–7.)  First, Defendant argues that Plaintiff fails to establish the necessary causal link of this purported PMA violation to Decedent's injury because Decedent "received an [a]larm indicating an issue with the pump and the resultant suspension of insulin" which then caused her to reach out to customer support.  (Def.'s SAC Mem. 13–14.)  Second, Defendant contends that Plaintiff does not allege how an alert or alarm, worded differently "could or would have altered the outcome."  (*Id.* at 14.)

Plaintiff argues that "[h]ad the [X2 P]ump been designed in accordance with the FDA PMA requirements, including proper alerts and/or alarms for pump malfunction, mechanical failure and/or drive train failure, the injuries and death of [ ] [D]ecedent could have been

28

avoided." (Pl.'s SAC Opp'n 8.)  First, Plaintiff argues that "[a]s a result of these deviations from the approved design set forth in the SAC, [Decedent] did not receive accurate information regarding the pump malfunction that occurred on January 21, 2022, and was instead advised of an inaccurate malfunction by both the X2 Pump and [Defendant's] customer support agent." (*Id.* at 14.)  Second, Plaintiff contends that this resulted in Decedent "being unable to respond to the malfunction or attempt to remedy [the malfunction]" and was instead "led through futile efforts relating to the insulin cartridges and ultimately died as a result." (*Id.*)

Even assuming Plaintiff properly pleads a deviation from the PMA-approved design, Plaintiff fails to plausibly plead a causal link between the alleged lack of "proper alerts" and Decedent's death. (*See* SAC ¶ 34.)  As discussed *supra* Section II.b, to survive preemption, a claim must specifically link a PMA deviation or violation of federal law to the alleged injury. *See Kaemmlein v. Abbott Lab'ys*, 564 F. Supp. 3d 58, 66 (E.D.N.Y. 2021) ("[T]o state a plausible product liability claim that avoids federal preemption, a plaintiff must set forth facts pointing to specific premarket approval requirements that have been violated *and link those violations to his injuries.*" (emphasis in original) (quoting *Cordova v. Smith & Nephew, Inc.*, No. 14-CV-351, 2014 WL 3749421, at *5 (E.D.N.Y. July 30, 2014))); *Crissi*, 2016 WL 4502038, at *2 ("[T]o survive preemption, claims must set forth a specific problem with or violation of federal law, be specific to the subject device and link that violation to the alleged injury."); *Burkett*, 2014 WL 1315315, at *4 (finding that "none of [plaintiff's] claims state[d] a parallel claim because each fail[ed] (1) to allege a violation of federal law that is specific to the device at issue . . . and/or (2) to tie the alleged violation to [plaintiff's] purported injuries"); *Gale*, 989 F. Supp. 2d at 249 ("[T]o state a parallel claim plaintiff must 'set forth facts pointing to specific [premarket approval] requirements that have been violated,' and link those violations to his injuries." (second alteration in original) (first quoting *Wolicki-Gables*, 634 F.3d at 1301; and then citing *Desabio*, 817 F. Supp. 2d at 204)).

29

Plaintiff does not sufficiently link the alleged PMA violation — an inadequate warning — to the alleged injury — Decedent's death.  Plaintiff alleges that the X2 Pump lacked "appropriate alarms and/or alerts" that would have prevented the injury.  (SAC ¶ 18.)  However, Plaintiff does not plausibly allege how a "proper alert" would have prevented the injury (*i.e.*, prevent Decedent's death).  (*See id.* ¶¶ 17–18, 34.)  Plaintiff's argument that the device "was not designed with any alert or alarm that would notify the user or the manufacturer of any mechanical malfunctions or failures, thus leading to a substantial likelihood of harm," (Pl.'s SAC Opp'n 14), contradicts the alleged warning that Decedent received which stated "ALL DELIVERIES STOPPED" and "cartridge cannot be used," (SAC ¶ 18), thus notifying Decedent that the insulin delivery stopped and her device had failed.  In fact, Plaintiff pleads that Decedent was advised that her X2 Pump had malfunctioned and Decedent was not receiving insulin, prompting Decedent to contact Defendant's customer support.  (*Id.* ¶ 22.)  Regardless of the source of the malfunction — whether drive train failure or cartridge failure — the X2 Pump warning advised Decedent of insulin delivery failure.  Plaintiff's contentions that the alleged violation — Defendant's deviation from the PMA-approved design by failing to include a different malfunction alarm — caused the injury do not identify how the violation caused the alleged injury nor establish a causal link.  Such allegations are conclusory and therefore insufficient to plead causation.[18]  *See McConologue*, 8 F. Supp. 3d at 110 (dismissing the plaintiff's negligent design claim as "nothing more than conclusory allegations and "naked assertion[s] devoid of further factual enhancement" (quoting *Iqbal*, 556 U.S. at 678)).  Therefore, Plaintiff fails to plausibly allege how a different type of warning would have prevented the

---

[18]  Plaintiff fails to provide any case law in support of his argument that Plaintiff's allegations that the alleged deficient warning caused Decedent's death is sufficient to plead causation.  (*See* Pl.'s SAC Opp'n 14–15.)

30

unfortunate outcome of the Decedent's death and fails to link Defendant's alleged violation to Decedent's death. *See Burkett*, 2014 WL 1315315, at \*6–7 (dismissing parallel claims where plaintiff failed to tie the alleged federal regulatory violations to her alleged injuries, explaining that identifying FDA violations without alleging how they caused the injury is insufficient to avoid preemption); *Horowitz*, 613 F. Supp. 2d at 282 (dismissing the plaintiff's defective design claim as preempted because the plaintiff failed to link the alleged federal violations with her specific injury).

### c.   Plaintiff's wrongful death claim

Defendant contends that because "Plaintiff's wrongful death claim only survives if Plaintiff's negligent defective design claim is viable" and "Plaintiff's negligent defective design claim fails and should be dismissed," Plaintiff also fails to state a wrongful death claim. (Def.'s SAC Reply 7–8.)

Plaintiff argues that his wrongful death claim survives because he sufficiently pleads a cause of action for his negligent design claim. (Pl.'s SAC Opp'n 15.)

Under New York law, wrongful death is an exclusively statutory cause of action. N.Y. Est. Powers & Trusts Law § 5-4.1; *Dixon v. United States*, No. 20-CV-4660, 2025 WL 3657157, at \*3 (E.D.N.Y. Oct. 3, 2025) (same), *report and recommendation adopted*, 2025 WL 3654529 (E.D.N.Y. Dec. 17, 2025); *Barbara v. United States*, No. 17-CV-1982, 2020 WL 5658724, at \*6 (E.D.N.Y. Sep. 23, 2020) ("There is no common law wrongful death cause of action to recover damages in New York, rather, a party can only bring a statutory wrongful death action." (citations omitted)); *Hernandez v. N.Y.C. Health & Hosps. Corp.*, 78 N.Y.2d 687, 692 (1991) ("The wrongful death cause of action in New York is exclusively statutory, the first such statute having been enacted in 1847."). A wrongful death claim is predicated on a "wrongful act, neglect or default which caused the decedent's death against a person who would have been

31

liable to the decedent by reason of such wrongful conduct if death had not ensued." N.Y. Est. Powers & Trusts Law § 5-4.1(1); *see In re Terrorist Attacks on Sep. 11, 2001*, No. 03-MDL-1570, 2024 WL 3046225, at *2 (S.D.N.Y. June 17, 2024) (quoting same as "the core requirement" of "wrongful death claims"); *see also Grosshandels-Und Lagerei-Berufsgenossenschaft v. World Trade Ctr. Props., LLC*, 435 F.3d 136, 140 (2d Cir. 2006) (explaining that New York's wrongful death statute "provide[s] certain individuals with the right to recover for pecuniary loss caused by the wrongful acts of third parties" (citing N.Y. Est. Powers & Trusts Law § 5-4.1)). "The necessary elements of a cause of action to recover damages for wrongful death are: '(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent.'" *Alves v. New York State Dep't of Corr.*, No. 24-CV-425, 2025 WL 4091267, at *8 (W.D.N.Y. Dec. 16, 2025) (quoting *Chong v. N.Y.C. Transit Auth.*, 441 N.Y.S.2d 24, 25–26 (App. Div. 1981)), *report and recommendation adopted sub nom. Alves v. Annucci*, 2026 WL 245524 (W.D.N.Y. Jan. 20, 2026); *Est. of Richards by Stephens v. City of New York*, No. 18-CV-11287, 2024 WL 3607220, at *13 (S.D.N.Y. July 31, 2024) (quoting *Freeland v. Erie Cnty.*, 167 N.Y.S.3d 683, 685 (App. Div. 2022)) (same).

Because the Court finds that Plaintiff's negligent defective design claim fails, Plaintiff's wrongful death claim also fails. *See Frei v. Taro Pharm. U.S.A., Inc.*, 443 F. Supp. 3d 456, 464, 471 (S.D.N.Y. 2020) (dismissing wrongful death claim because plaintiffs "fail[ed] plausibly to plead a wrongful act on the part of [the defendant]" as their strict liability, negligence, misrepresentation and deception, and fraud claims were preempted or failed to state a claim), *aff'd*, 844 F. App'x 444 (2d Cir. 2021)); *Bowdrie v. Sun Pharm. Indus. Ltd.*, 909 F. Supp. 2d

32

179, 190 (E.D.N.Y. 2012) (dismissing wrongful death claim because "the only wrongful acts [p]laintiffs allege that could provide a basis of liability against the [d]efendants are dismissed as preempted under federal law or for a failure to state a plausible claim"); *Tuosto v. Philip Morris USA Inc.*, No. 05-CV-9384, 2007 WL 2398507, at *16 (S.D.N.Y. Aug. 21, 2007) (dismissing wrongful death claim because the plaintiff's fraud, concerted action, strict products liability, and negligence claims were dismissed as preempted by federal law or for failure to adequately plead the elements of the claims).  Accordingly, the Court dismisses Plaintiff's wrongful death claim for failure to state a claim.

### d.   Dismissal with prejudice

Defendant contends that the SAC should be dismissed with prejudice because "Plaintiff's claims remain preempted on a third attempt even though Plaintiff was specifically informed as to how to replead."  (Def.'s SAC Mem. 20.)

Plaintiff has not requested leave to further amend the SAC, has not indicated that he lacks access to documents necessary to plead a parallel claim, and has not suggested that any additional facts are necessary to plausibly assert non-preempted claims.

Although "[l]eave to amend should be freely give[n] . . . when justice so requires," *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2015) (second alteration in original) (citation and internal quotation marks omitted), courts need not grant amendments when they are "futile" and "would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure," *Jang v. Trs. of St. Johnsbury Acad.*, 771 F. App'x 86, 88 (2d Cir. 2019) (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)).

The Court dismisses the SAC with prejudice.  *See Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1009–10, 1115 (2d Cir. 2024) (affirming dismissal of federal and

preempted state law claims with prejudice and finding district court did not err in denying further leave to amend where plaintiff "did not file a motion for leave to amend . . . or propose a second amended complaint," "it appear[ed] beyond doubt that the plaintiffs [could] prove no set of facts in support of their claims which would entitle them to relief" and the "claims fail[ed] as a matter of law" (brackets omitted) (first quoting *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 221 (2d Cir. 2006); and then quoting *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011))); *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 297 (2d Cir. 2022) (affirming dismissal of preempted claims with prejudice and finding "the district court correctly determined that any leave to re-plead would be futile" because plaintiff "failed to articulate any allegations that he could add in a second amended complaint that [would] overcome preemption"); *In re Trib. Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 166 (2d Cir. 2021) (finding district court did not abuse its discretion in dismissing state law claims with prejudice because the defendant "ha[d] not explained what specific facts he would plead to salvage the[] claims"); *City of New York v. Chevron Corp.*, 993 F.3d 81, 103 (2d Cir. 2021) (affirming district court's dismissal of complaint in its entirety with prejudice where the state law claims were preempted by federal common and statutory law); *Nagel v. Smith & Nephew, Inc.*, No. 15-CV-927, 2016 WL 4098715, at *9 (D. Conn. July 28, 2016) (dismissing with prejudice plaintiff's preempted strict products liability, failure-to-warn, and negligence claims because plaintiff did not suggest that "he is missing discovery on vital facts about how the defendant deviated from the FDA requirements in the design, manufacture, or testing of the" device at issue); *see also Tillet v. CooperSurgical, Inc.*, No. 23-CV-6031, 2023 WL 4704091, at *6 (W.D.N.Y. July 24, 2023) (denying leave to amend preempted claims for strict liability and negligent design defect and failure to warn against device manufacturers because "there is no set of facts that [p]laintiff could plead that would evade preemption").

34

## III.  Conclusion

For the foregoing reasons, the Court grants Defendant's motion to dismiss the SAC and dismisses the SAC with prejudice.

Dated:  April 27, 2026
          Brooklyn, New York

SO ORDERED:

                 _____/s/MKB_____
                 MARGO K. BRODIE
                 United States District Judge